IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **23-11423-A**

United States of America,

Appellee,

- versus -

Suzanne Ellen Kaye,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____

<u>BRIEF FOR THE UNITED STATES</u>

Markenzy Lapointe
United States Attorney
Attorney for Appellee
99 N.E. 4th Street
Miami, Florida 33132-2111
(305) 961-9062

Daniel Matzkin
Chief, Appellate Division

Brandy Brentari Galler
Assistant United States Attorney

Alix I. Cohen
Assistant United States Attorney
Of Counsel

## United States v. Kaye, Case No. 23-11423-A
## Certificate of Interested Persons

In compliance with Fed. R. App. P. 26.1 and 11th Circuit Rules 26.1 and 28-1, the undersigned certifies that the list below is a complete list of the persons and entities previously included in the government's CIP, as well as additional persons and entities (designated in bold face) who have an interest in the outcome of this case.

Adler, Andrew L.

Berry, Scott G.

Brannon, Hon. David Lee

Brown, Richard O.I.

Caruso, Michael

**Cohen, Alix I.**

**Darsch, Shannon**

Dispoto, Mark

Fajardo Orshan, Ariana

**Galler, Brandy Brenatri**

Gonzalez, Juan Antonio

Kaye, Suzanne Ellen

Kirkpatrick, Lynn

## United States v. Kaye, Case No. 23-11423-A

## Certificate of Interested Persons (Continued)

Lapointe, Markenzy

Matzkin, Daniel

McCrae, Caroline

Militello, Kristy

Reinhart, Hon. Bruce E.

Rosenberg, Hon. Robin L.

Rubio, Lisa Tobin

Schiller, Gregory

United States of America

Zloch, William T.

*/s/ Alix I. Cohen*
Alix I. Cohen
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States of America respectfully suggests that the briefs and record before this Court adequately present the facts and legal arguments and that oral argument would not significantly aid the decisional process.

# Table of Contents

**Page:**

Certificate of Interested Persons  ............................................................. c-1

Statement Regarding Oral Argument  ........................................................i

Table of Contents  ....................................................................................ii

Table of Citations  ...................................................................................iv

Statement of Jurisdiction  ......................................................................viii

Introduction  ............................................................................................1

Statement of the Issues ............................................................................ 1

Statement of the Case:

      1.     Course of Proceedings and Disposition in the Court Below  ......2

      2.     Statement of the Facts  ...........................................................3

           A.    The Government's Case...................................................3

           B.    The Defense Case ..........................................................7

           C.    The Exclusion of Defense Expert on Media Law..............8

           D.    The Jury Instructions ................................................... 12

      3.     Standards of Review  ............................................................ 16

Summary of the Argument  ..................................................................... 17

# Table of Contents

## (continued)

**Page:**

Argument and Citations of Authority:

I.    The District Court Properly Informed the Jury About What Constitutes a True Threat and What Does Not .................................................... 18

    A.    The District Court Did Not Abuse its Discretion by Excluding the Defense's Expert on Political Speech Because his Testimony on Legal Issues Would Not Help the Jury and Would Cause Confusion................................................................................... 19

    B.    The District Court Did Not Abuse its Discretion by Giving the Pattern Instruction on § 875(c) and an Abridged Defense Theory Instruction ................................................................. 23

II.    The Judge's Repeated Instructions that the Jury Could Convict Kaye Based Only on the Evidence and the Law Ensured she was Not Convicted Based on her Political Views. ......................................... 29

Conclusion  ........................................................................... 35

Certificate of Compliance.......................................................... 37

Certificate of Service  .............................................................. 37

iii

# Table of Citations

**Cases:**                                                                                        **Page:**

*Bhogaita v. Altamonte Heights Condo Ass'n, Inc.*,

    765 F.3d 1277 (11th Cir. 2014)............................................................22, 23

*Commodores Entm't Corp. v. McClary*,

    879 F.3d 1114 (11th Cir. 2018)............................................................20, 22

*Counterman v. Colorado*,

    143 S. Ct. 2106 (2023).................................................................. 18, 23, 25

*Daubert v. Merrell Dow Pharmaceuticals*,

    509 U.S. 579 (1993) ................................................................................ 19

*Elonis v. United States*,

    135 S. Ct. 2001 (2015)...........................................................................13, 25

*Montgomery v. Aetna Cas. & Sur. Co.*,

    898 F.2d 1537 (11th Cir. 1991) ............................................................... 20

*Pesaplastic, C.A. v. Cincinnati Milacron Co.*,

    750 F.2d 1516 (11th Cir. 1985) ............................................................... 27

*Tracy v. Fla. Atl. Univ. Bd. of Trustees*,

    No. 16-cv-80655 (DE 409) (S.D. Fla.), *aff'd*,

    980 F.3d 799 (11th Cir. 2020).................................................................. 34

# Table of Citations

## (Continued)

<u>**Cases:**</u>                                                                                <u>**Page:**</u>

*United States v. Curtin*,

    --F.4th --, 2023 WL 5521087 n.3 (11th Cir. Aug. 28, 2023)....................... 23

*United States v. Davis*,

    724 F.3d 949 (7th Cir. 2013) ..................................................................... 27

*United States v. Fleury*,

    20 F.4th 1353 (11th Cir. 2021)....................................................... 16, *passim*

*United States v. Frazier*,

    387 F.3d 1244 (11th Cir. 2004)..................................................... 16, 19, 20

*United States v. Hoffman*,

    806 F.2d 703 (7th Cir. 1986) ..................................................................... 32

*United States v. Hunt*,

    573 F. Supp. 3d 779 (E.D.N.Y. 2021)....................................................... 33

*United States v. Laury*,

    49 F.3d 145 (5th Cir. 1995) ....................................................................... 31

*United States v. Machado*,

    886 F.3d 1070 (11th Cir. 2018)................................................................. 16

# Table of Citations

## (Continued)

**Cases:**                                                                                    **Page:**

*United States v. Pon,*

   963 F.3d 1207 (11th Cir. 2020) .................................................................. 22

*United States v. Prather,*

   205 F.3d 1265 (11th Cir. 2000) .................................................................. 16

*United States v. Scoop,*

   846 F.2d 135 (2d Cir. 1988) ...................................................................... 20

*United States v. Singer,*

   963 F.3d 1144 (11th Cir. 2020) .................................................................. 29

*United States v. Sisson,*

   399 U.S. 267 (1970) ................................................................................... 34

*United States v. Watkins,*

   42 F.4th 1278 (11th Cir. 2022) .................................................................. 16

*Virginia v. Black,*

   538 U.S. 343 (2003) ................................................................................... 25

*Watts v. United States,*

   394 U.S. 705 (1969) ..............................................................................19, 22

**<u>Statutes & Other Authorities</u>:**                                   **<u>Page</u>:**

18 U.S.C. § 115 ................................................................... 33

18 U.S.C. § 875 ................................................................ 1, *passim*

18 U.S.C. § 3231 ................................................................ viii

28 U.S.C. § 1291 ................................................................ viii

Fed. R. App. P. 4 ................................................................ viii

Fed. R. App. P. 26.1 ............................................................. 3

Fed. R. App. P. 32 ............................................................... 37

Fed. R. Evid. 702 ................................................................ 19

Fed. R. Evid. 403 ........................................................... 9, 11, 19

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Southern District of Florida in a criminal case. The district court entered judgment against Suzanne Ellen Kaye on April 24, 2023 (DE 169). The district court had jurisdiction to enter the judgment pursuant to 18 U.S.C. § 3231. Kaye filed a timely notice of appeal on April 28, 2023 (DE 175). *See* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## Introduction

Suzanne Kaye threatened to "shoot" an FBI agent's "f\*\*king ass" if he came to her house. She made this threat in two similar, but increasingly angry, videos that she posted on social media, just a few days after inviting an agent to her house to discuss her knowledge of the January 6 attack on the Capitol. She was tried on two counts of transmitting an interstate threat, in violation of 18 U.S.C. § 875(c).

The district court properly instructed the jury on the law. It gave the pattern instruction for an § 875(c) offense—which correctly defines true threats in accordance with this Court's precedents—and a defense theory instruction summarizing the defense's position that Kaye's statements were protected political speech. The jury acquitted on the first count but convicted on the second—a result that is consistent with the First Amendment, as the First Amendment does not protect true threats of violence.

Because the properly instructed jury found that Kaye's statements constituted a true threat, there is no reason to disturb the jury's verdict. This Court should affirm Kaye's conviction.

## Statement of the Issues

I.    Whether the district court abused its discretion by (A) excluding expert testimony from a media law professor who proffered legal conclusions, or (B) giving the pattern jury instruction for an § 875(c) offense, along with a concise instruction on the defense theory, instead of Kaye's proposed instructions.

II.    Whether the district court abused its discretion by declining to instruct the jury that Kaye could not be convicted based on her political views, even though the court informed the jury many times that it could convict Kaye based only on the evidence and the law and that it "must not be influenced" by "prejudice against the defendant."

## Statement of the Case

### 1.    <u>Course of Proceedings and Disposition in the Court Below</u>

A Southern District of Florida grand jury returned a superseding indictment charging Kaye with two counts of threatening to injure an FBI agent in violation of 18 U.S.C. § 875(c) (DE 86). Each count was based on a separate video Kaye posted on social media threatening to "shoot" an FBI's agent's "f**king ass" (DE 86).[1]

---

[1]  Kaye was initially charged with only one § 875(c) count based on a single video (DE 17). She moved to dismiss the initial indictment on First Amendment grounds (DE 26), but the court denied her motion because "[w]hether a statement constitutes a 'true threat' is a question generally to be decided by the trier of fact" (DE 35:9). At trial, Kaye also moved for judgment of acquittal on

After a three-day trial, the jury acquitted Kaye of Count 1 but found her guilty of Count 2 (DE 184:59-60; DE 121). The court imposed 18 months' imprisonment, to be followed by two years' supervised release (DE 169).[2]

Kaye timely appealed (DE 175).

## 2. <u>Statement of the Facts</u>

### A. The Government's Case

On January 16, 2021, the FBI's National Threats Operation Center received a tip that Kaye may have information about the January 6 attack on the Capitol (DE 182:197, 205, 207). The FBI forwarded the tip to their West Palm Beach office and Special Agent Arthur Smith was assigned to investigate it (DE 182:198, 205-07; DE 183:104).

After receiving the tip, Agent Smith visited Kaye's last known address in Lake Worth, Florida, but there were notes on the door indicating she no longer lived there (DE 182:217). He then called Kaye on January 28, 2021, identified

---

First Amendment grounds, but the court denied the motion, finding sufficient evidence for the jury to decide whether she made a true threat (DE 183:207-08). Kaye does not challenge either of those rulings on appeal.

[2] At the sentencing hearing, the medical director for the southeast region of BOP testified that a federal medical center in Texas, FMC Carswell, could provide the level of medical care Kaye needs due to her epilepsy (DE 185:139-40, 147). The court permitted Kaye to self-surrender to that facility by July 13 to avoid any lapse in treatment as a result of transportation between facilities (*id.* at 140, 203). Kaye is currently incarcerated at FMC Carswell. *See* https://www.bop.gov/inmateloc/ (last checked 9/11/23).

himself as an FBI agent, and explained that he was calling to ask her about her travel to Washington D.C. on January 6 (DE 182:221, 224; DE 183:15).

Kaye asked Agent Smith if he had any proof that she had traveled to D.C. on that date (DE 182:221). He said that was the reason for the call and asked if he could "have a conversation with her about it" (DE 182:221). Kaye advised that she had moved to Boca Raton and asked if he could come to her house to interview her because she did not drive (DE 182:221-222). She provided her current address and appeared willing to talk (DE 182:223). Agent Smith initially said that he would be there that afternoon, but later that day he called and left her a voicemail explaining that he would not be able to make it that evening (DE 182:222, 225). Agent Smith "believe[s]" he also indicated that he would contact her again, but he never heard back from Kaye (DE 182:225).

A few days later, on February 2, Agent Smith tried to contact Kaye again (DE 183:15-16). He went to her house and knocked on the door, but there was no answer (DE 183:16-17). He also tried calling her, but she did not answer her phone either (DE 183:17).

Unbeknownst to Agent Smith, Kaye had posted a video on social media the day before, February 1st—just four days after their initial phone call— threatening to shoot FBI agents if they came to her house, despite having invited Agent Smith to do just that (DE 183:22, 46; GX 1). A tipster alerted the FBI of

4

this threat about a week later (DE 182:200; DE 183:22-23). The investigation revealed that Kaye had posted that video on Facebook under the profile name "Angry Patriot Hippie" (DE 183:43-46). In the video, titled "F**k the FBI," Kaye took a swig from a Jack Daniels bottle, then announced:

> Just got a call from the FBI, and they want to come talk to me about my visit to D.C. on January 6. I told them you can't come and talk to me unless I have counsel, and being that I can't afford counsel, you'll have to arrest me so I can use my right of counsel. You guys just spent four years persecuting a three-star general with no evidence, you think I'm gonna let you come f**king talk to me? You're out of your motherf**king mind, bro. That's not gonna happen. I'm a f**king patriot, and *I exercise my First Amendment right on my freedom of speech and my Second Amendment right to shoot your f**king ass if you come here*.

(GX 2) (emphasis added). This Facebook video formed the basis for Count 1 of the superseding indictment (GX 8).

Kaye posted the same video on Instagram just a few seconds after posting it on Facebook (GX 3; DE 183:47-49). She also posted a second, similar video on Instagram a few minutes after that, in which she appears even angrier (GX 4; DE 183:49). Again, after taking a swig from a whiskey bottle, she says:

> Just got a call from the FBI; they want to come talk to me about my visit to DC on January 6. I told them bro, I ain't going to talk to you unless I have counsel and being that I can't afford counsel right now, you're going to have to arrest me so I can exercise my right to counsel. And being that you don't even know where I live and you have to ask me, I ain't talking to you either. You just spent four years persecuting a three-star general with no evidence, you think I'm gonna f**king let you come talk to me? I'm an American, I know my f**king rights. My First Amendment right to free speech,

5

my Second Amendment right to carry a gun, *to shoot your f\*\*king ass if you come to my house*. So f\*\*k you, f\*\*k you following me, I don't f\*\*king care. I'm glad you know who I am mother f\*\*ker.

(GX 4; DE 183:49-50) (emphasis added). This Instagram video formed the basis for Count 2 of the superseding indictment (DE 86; GX 8).

Kaye posted the same video—including the threat "to shoot your f\*\*king ass if you come to my house"—on TikTok, but the TikTok version also featured a country-music version of the song "Every Breath You Take" (originally by The Police) in the background (GX 7; DE 183:25-26, 51). The videos were publicly available from the time they were posted on February 1 until Kaye's arrest on February 17 (DE 183:56).

After viewing the videos, Agent Smith took Kaye's words seriously, and decided that he "wouldn't be going to her house anymore" because Kaye threatened to shoot him if he did (DE 183:23-24, 90-91). He was "shocked" by "the anger" Kaye expressed, discussed the video with his supervisor, and then began an investigation (DE 183:24-26). Agent Smith's supervisor, Agent Paul Allen, likewise took it as a "very serious threat" against Agent Smith based on Kaye's reference to her phone call with him and her statement that "if [he] shows up at her door, she would shoot [him]" (DE 183:107-09; *see also id.* at 107 ("I saw an individual on the video making a very articulate and direct threat")). Agent Allen instructed Agent Smith to cease any potential contact with Kaye

and immediately open a threat case (DE 183:110-111).

On February 16, the FBI had an operational meeting with about 10-15 agents to discuss how to effectuate Kaye's arrest, including reviewing safety protocols (DE 183:33-34). The FBI arrested Kaye outside her home the next day (DE 183:113-14). During her arrest, about 10 agents were present, including FBI SWAT operators who were chosen because of their tactical backgrounds and because they typically carry long guns (DE 183:113-15). Fire rescue stood by in case of incident (DE 183:113).

### B.    The Defense Case

The defense called Kaye, who testified on her own behalf (DE 183:125). Kaye said that when the FBI called her, she thought it was a joke (DE 183:155, 157), and she used the "prank" call as an idea for a TikTok video (DE 183:177). She did not recall receiving Agent Smith's message saying he could not make it that day (DE 183:157).

Kaye also testified that she posts videos on social media to gain followers, and has over 5,000 followers on TikTok, and a few thousand on Facebook and Instagram (DE 183:153). She claimed she posted three versions of the video because she does not know how to edit, but only intended to post "the best one" (DE 183:161). She also asserted that the videos were "all an act" (DE 183:173) and she did not intend to threaten Agent Smith or any FBI agent (DE 183:163).

In closing, the defense argued that Kaye's speech was protected by the First Amendment, elaborating on the types of speech the First Amendment protects (DE 184:40-41 ("It is about . . . the freedom to say something offensive, particularly to the government, without fear of repercussions")). The defense urged the jurors to set aside their personal views of Kaye's speech, explaining that the First Amendment protects Kaye "even if you think what she said was stupid, ridiculous, frightening, a bad idea" (*id.* at 41-42).

## C.    The Exclusion of Defense Expert on Media Law

Before trial, Kaye gave notice of her intent to call as an expert a media law professor, Dr. P. Brooks Fuller, who has a Ph.D. in Mass Communications with an emphasis on media law and policy (DE 58). Kaye intended to call Dr. Fuller to "testify to the historical and contemporary protection afforded to controversial political expression" (*id.*). She planned to have him "testify to the contextual factors used to distinguish protected political expression from true threats," and to opine, based on "the body of case law on true threats and social media," that her videos "do[ ] not articulate a true threat in violation of 18 U.S.C. § 875(c)" (*id.*). The government moved to exclude Dr. Fuller, arguing that his testimony would infringe on the court's role in instructing the jury on the law and confuse the jury as to what legal standards to apply (DE 62).

8

The court held a *Daubert* hearing, at which Dr. Fuller opined that "neither of the three videos contain[ed] a true threat" (DE 178:21). He testified that he reached that conclusion by comparing the videos "to other communication in high conflict political arenas across four key domains," which include: the history of political speech, linguistics, the choice of media platform, and the social context or intended audience (*id.* at 21-71). Dr. Fuller explained that these contextual factors inform how audiences perceive speech, discussing the factors both in general and as applied to Kaye's videos (*see id.*). For example, Dr. Fuller testified generally about the history of "violent expression" as political rhetoric and the rise of social media as the modern "town square" (*id.* at 24-28, 50-53). He also testified about specific contextual cues in Kaye's videos (such as her use of profanity, tone, hyperbole, references to constitutional rights) that would affect how viewers interpreted the videos (*see id.* at 32, 38, 46-47, 71). Dr. Fuller noted that someone "who sees themselves on the left" politically would be more likely to "flag" or "report" Kaye's speech (*id.* at 42-43).

Although the district court found that Dr. Fuller qualified as an expert on political speech, it excluded his testimony on two grounds: it was not helpful under Federal Rule of Evidence 702(a), and any probative value was substantially outweighed by the risk of confusing the issues under Federal Rule of Evidence 403 (DE 83). The court divided the proposed testimony into two

"buckets": (a) "case-specific testimony," such as whether Kaye "articulated a true threat, whether a reasonable person viewing the video would have regarded it as such, and how contextual cues . . . would affect one's perception of the video"; and (b) "generalized testimony about mass media, including the way people interact on social media, how people generally conduct themselves in politically sensitive or fraught contexts, the historical use of violence as a political rhetorical device, and the history of legal protections for political speech" (*id.* at 3).

As for the case-specific testimony, the court found that Dr. Fuller's opinion that Kaye did not articulate a true threat was a "legal conclusion" that invaded the province of the jury (*id.* at 4-5). And the court found his testimony about how a reasonable person would view the videos was not helpful, because people "interpret social cues, tone, rhetoric, [and] non-verbal conduct" every day (*id.* at 5-6). The jurors could use "their own experience and judgment" to determine how a reasonable person would view the videos "without the guidance of an expert" (*id.* at 6).

The court also concluded that the case-specific testimony posed a high risk of confusing the jury, and thus should be excluded under Rule 403, for four reasons. First, although Dr. Fuller did not testify about Kaye's intent, "the jury might conflate his expert evaluation of whether a true threat existed with Ms.

Kaye's intent for how the statements would be perceived" (*id.* at 7). Second, Dr. Fuller's testimony might confuse the jury about the "nature of the reasonable standard," by suggesting that lay people cannot pass judgment without expert help (*id.*). Third, his testimony about various contextual factors might mislead the jury into thinking those factors "are elements it must consider" in deciding whether Kaye made a true threat (*id.* at 8). And fourth, Dr. Fuller's testimony about how a viewer's political affiliation would impact perception might confuse the jurors "about whether they should view the statements from the perspective of a sympathetic or antagonistic viewer" (*id.* at 8-9). But "[t]he standard is not 'a reasonable person in Ms. Kaye's intended or likely audience'—the standard is a 'reasonable person'" (*id.* at 8).

As for the generalized topics, the court also found that this testimony was barred by Rules 702 and 403. The court concluded that Dr. Fuller's testimony on the contextual factors—including how people behave on social media—would not be helpful, because that information is widely known due to the "ubiquity of social media today" (*id.* at 10-11). And his testimony about contextual factors posed a high risk of confusing the jury "as to what legal and factual considerations they may weigh in reaching their ultimate conclusion" (*id.* at 9-10). For example, the court explained, "the history of constitutional protections for political speech that invokes violence may confuse the jury on

11

what law they are to apply. It also does not make the jury's job any easier to determine whether *this* speech constituted a true threat" (*id.* at 10).

## A. The Jury Instructions

The defense requested, and the government opposed, three proposed jury instructions: a modified § 875(c) offense instruction, a defense theory instruction elaborating on what types of speech the First Amendment has historically protected, and an instruction informing the jury that it could not convict Kaye based on disagreement with her political views (DE 107:14-23).

As for the § 875(c) charge, the government requested the pattern instruction, which defines a "true threat" as "a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would place a reasonable person in fear of being injured" (DE 107:14 n.1; 11th Cir. Crim. Pattern Instr. (Criminal) O30.3). The defense proposed a modified § 875(c) instruction, which removed the pattern's definition of a true threat and added, in pertinent part:

> An issue in this case is whether the defendant's speech was constitutionally protected political speech or whether it constituted a "true threat." "True threats" encompass statements in which the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. A "true threat" is not the same as crude, reactionary, unpleasant, or offensive language. Speech that merely advocates force or violence, when it does not incite imminent lawless action, is protected under the First Amendment.

In considering whether speech was a "true threat," you must also consider the entire context in which her speech was made. For example, the Supreme Court has found that telling a group of protestors at an anti-draft political rally at the height of the Vietnam war that "if they ever make me carry a rifle the first man I want to get in my sights" is the president was constitutionally protected political speech and *not* a true threat. In so doing, the Court considered the entire context in which the statement was made and not solely the defendant's words.

(DE 107:16-18; DE 183:197-201). The court rejected the modification and gave

the pattern, which is based on *Elonis v. United States*, 135 S. Ct. 2001 (2015):

It's a Federal crime to knowingly send in interstate commerce a true threat to injure any person.

The Defendant can be found guilty of this crime only if the following facts are proved beyond a reasonable doubt:

(1)    the Defendant knowingly sent a message in interstate commerce containing a true threat to injure the person of another; and

(2)    the Defendant sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat.

To transmit something in "interstate commerce" means to send it from a place in one state to a place in another state.

The government does not have to prove that the Defendant intended to carry out the threat.

A "true threat" is a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would place a reasonable person in fear of being injured.

(DE 183:203-04; DE 184:7-8; DE 119:9).

13

The defense also requested a defense theory instruction which further expanded on the types of speech the First Amendment protects:

> The First Amendment of the United States Constitution protects the content of speech and only permits restrictions in a few, well-defined exceptions. The only possible exception, which may be relevant to this case, is a "true threat," in which the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The First Amendment protects vehement, caustic, and sometimes unpleasant sharp attacks on public officials, including members of the Federal Bureau of Investigation (FBI), unless that speech is a "true threat." Indeed, the freedom to verbally oppose or challenge police officers without risk of arrest is one of the principal characteristics distinguishing our free nation from a police state. As such, law enforcement must tolerate coarse criticism and exercise greater restraint in their response than the average citizen. The language of the political arena . . . is often insulting, abusive, and inaccurate and the First Amendment protects very crude offensive method[s] of stating political opposition. Cursing, when used in connection with political speech, and the use of hurtful speech pertaining to public issues is protected under the First Amendment to ensure that we do not stifle public debate. Indeed, speech on public issues is afforded greater protection than speech involving solely private matters because of the need to safeguard free and robust debate of political issues. The First Amendment protection of speech also applies to the internet because it has become the modern public square.

> If you have a reasonable doubt whether Ms. Kaye's speech was protected by the First Amendment, then you must find her not guilty.

(DE 107:19-21; DE 183:201-02). The court agreed to give a defense theory instruction, but it modified the instruction to be "consistent with case law" and

14

removed "additional language" that was "not necessary" (DE 183:204; DE

117). The court charged:

> The First Amendment of the United States Constitution permits
> restrictions upon the content of speech in only a few well-defined
> narrow classes of speech. The only exception relevant here is for
> "true threats." As I said before, a "true threat" is a serious threat—
> not idle talk, a careless remark, or something said jokingly—that is
> made under circumstances that would place a reasonable person in
> fear of being kidnapped, killed, or physically injured. Ms. Kaye
> contends that her statements were not "true threats," but rather,
> political speech protected by the First Amendment. If you have a
> reasonable doubt as to whether the statements made in the videos
> were "true threats," you must find Ms. Kaye not guilty as to all
> counts.

(DE 184:8-9; DE 119:10).

Finally, the defense proposed instructing the jury that it could not convict

Kaye based on her political views:

> You have just heard testimony and actually observed some exhibits
> related to what might be considered the Defendant's political views.
> You must treat this evidence with caution. This evidence alone
> cannot be used to find the Defendant guilty of the offense charged
> in the Indictment. It may, however, be considered by you for limited
> purposes, such as considering the context in which statements
> attributed to the Defendant were made, what the Defendant's intent
> was in making the statement, and her expectation regarding the
> effects of her statement. You cannot find the Defendant guilty
> because you disagree with or find distasteful her political views.

(DE 107:22-23; DE 183:205). The court declined to give the instruction, finding

it was not warranted but noting that the defense could make the argument in

closing (DE 183:205-06). The court did, however, instruct the jury that its

decision "must be based only on the evidence presented," and it "must not be influenced in any way by sympathy for or prejudice against the Defendant or the Government" (DE 184:3; DE 119:2).

### 3.   **Standards of Review**

This Court reviews "for abuse of discretion the district court's decisions regarding the admissibility of expert testimony." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

This Court likewise reviews "a district court's refusal to give a proposed jury instruction for abuse of discretion," *United States v. Watkins*, 42 F.4th 1278, 1282 (11th Cir. 2022), and "defer[s] on questions of phrasing absent an abuse of discretion." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000).[3]

---

[3] Kaye suggests that this Court reviews constitutional issues de novo, without clarifying whether she contends de novo review applies here (Br. 26). It does not. This appeal does not require the Court to resolve any constitutional question. Sure, this Court reviews evidentiary rulings that directly implicate a constitutional question de novo. *See United States v. Machado*, 886 F.3d 1070, 1085 & n.14 (11th Cir. 2018). But unlike in *Machado*, where the defendant claimed the challenged ruling itself violated his constitutional rights (the right to present a defense), Kaye argues that as a result of incorrect rulings, the jury reached a verdict that violated her rights. If that claim were subject to de novo review, this Court would review de novo every appeal from a conviction challenging evidentiary rulings or the rejection of requested jury instructions. But it does not. *See United States v. Fleury*, 20 F.4th 1353, 1373-74 (11th Cir. 2021) (reviewing the district court's refusal to give a requested defense instruction on the First Amendment only for an abuse of discretion).

## Summary of the Argument

This Court should affirm Kaye's § 875(c) conviction because the jury found her threat to "shoot" an FBI agent's "f**king ass" was a true threat, after being fully informed of the law.

The district court acted within its discretion when it excluded Dr. Fuller's testimony on political speech. His testimony on legal principles offered no more than what the lawyers could (and did) argue in closing and posed a high risk of confusing the jury as to what standards to apply. And, critically, it is for the court—not an expert—to instruct the jury on the law. The court did so properly here.

The court gave the pattern § 875(c) instruction and a theory-of-defense instruction, though not the entire instruction the defense requested. The court's jury charge was correct. The § 875(c) instruction made clear that the jury could convict Kaye "only if" she communicated a "true threat," ensuring that she could not have been convicted based on protected speech. And the defense theory instruction conveyed Kaye's contention that her statements were political speech protected by the First Amendment. The court did not abuse its discretion by giving these instructions, rather than those Kaye requested, because they covered the gist of her proposed instructions and did not substantially impair her ability to present an effective defense.

17

Nor did the court abuse its discretion when it declined to instruct the jury that Kaye cannot be convicted based on her political views. The same point was expressed by the court's repeated instructions that Kaye could be convicted based only on the evidence and the law, and that the jury "must not be influenced in any way by . . . prejudice against the defendant."

## Argument

The First Amendment does not protect "true threats." *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021); *Counterman v. Colorado*, 143 S. Ct. 2106, 2113 (2023) ("True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection."). The jury here found that Kaye's speech was a "true threat" after being properly instructed on the law.

## I.    The District Court Properly Informed the Jury About What Constitutes a True Threat and What Does Not.

Kaye asserts that the court did not adequately inform the jury about what constitutes protected political speech, because it excluded her proposed expert and declined to give her requested jury instructions expanding upon the types of speech the First Amendment protects (Br. 29-42). But the court acted within its discretion on both fronts.

**A.    The District Court Did Not Abuse its Discretion by Excluding the Defense's Expert on Political Speech Because his Testimony on Legal Issues Would Not Help the Jury and Would Cause Confusion.**

To be admissible, an expert's "specialized knowledge" must "help the trier of fact." Fed. R. Evid. 702(a); *see Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591 (1993). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63. Even "expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *Id.* at 1263. "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury." *Id.*; Fed. R. Evid. 403.

The district court's decision to exclude Dr. Fuller was sound for multiple reasons.

First, his testimony included impermissible legal conclusions. At the *Daubert* hearing, Dr. Fuller testified about what constitutes "political speech" (DE 178:23-24), a purely legal matter. *Cf. Watts v. United States*, 394 U.S. 705, 706-08 (1969) (holding the defendant's statement about the draft at a 1966 public rally—"[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J."—was protected political speech, not a true threat to kill the

19

president, based on context including that both the speaker and the audience laughed after the statement was made). Indeed, Kaye argues on appeal that Dr. Fuller should have been permitted to inform the jury "about *Watts* and the First Amendment tradition of which it was a part" (Br. 32). She implicitly acknowledges that these are legal questions, asserting that because of Dr. Fuller's exclusion, "[t]he jury only received half *of the law*" (Br. 30 (emphasis added)).

But "questions of law are not subject to expert testimony." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018). "Rather, 'the court must be the jury's only source of law.'" *Id.* (quoting *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1991)). The district court thus did not err by precluding Dr. Fuller from testifying about the legal contours of political speech, because "an expert witness may not substitute for the court in charging the jury regarding the applicable law." *Id.* at 1129. *See also United States v. Scoop*, 846 F.2d 135, 140 (2d Cir. 1988) (expert opinions that "invade the province of the court to determine the applicable law and to instruct the jury as to that law . . . could not have been helpful to the jury in carrying out its legitimate functions") (cleaned up).

Second, Dr. Fuller's testimony was not helpful because it "offer[ed] nothing more than what lawyers" can—and did—argue in closing. *See Frazier*,

387 F.3d at 1262-63. In closing, both parties discussed the broad array of speech the First Amendment protects (*see* DE 184:40 (defense closing: "The First Amendment protects all of us, and it protects a lot of things . . . It protects rap artists when they say f\*\*k the police . . . It protects people that burn flags and crosses, it protects hateful, horrible things. . ."); *id.* at 43 (government rebuttal: agreeing that the First Amendment protects "a very broad array of speech," including speech that is "angry," "hateful," and that "hurts")). The defense even explained the Supreme Court's holding in *Watts* in its closing argument: "The First Amendment protects. . . individuals [sic] at the Washington Monument at the height of the Vietnam War saying that if they put a gun in his hands to fight in that war that the first person he would have in his sights would be Lyndon B. Johnson, the President of the United States. It protects that person" (DE 184:40). The defense also explained the types of speech the First Amendment protects in opening (DE 182:185 ("The First Amendment gives Mrs. Kaye the right to criticize the government . . .")). And as the district court noted, Dr. Fuller's testimony on historical protections for political speech was unhelpful for another reason: it "does not make the jury's job any easier to determine whether *this* speech constituted a true threat" (DE 83:10).

Third, any probative value of Dr. Fuller's testimony was substantially outweighed by the risk of confusing the jury. As the district court explained, his

21

testimony about the history of constitutional protections for political speech "may confuse the jury on what law they are to apply" (DE 83:10). Likewise, his testimony that he determined Kaye's speech was not a true threat based on his analysis of "four key domains" may also confuse the jury as to what legal standards to apply. While the "context" of Kaye's speech is part of the true threat analysis, *see Watts*, 394 U.S. at 707-08, the jury need not consider each contextual factor identified by Dr. Fuller. And again, it is "[t]he district court's responsibility to serve as the singular sauce of law." *Commodores*, 879 F.3d at 1129.

The district court's ruling avoided the risk that the jury would substitute Dr. Fuller's judgment for its own, or his reasoning for the law. That decision was not an abuse of discretion. *See United States v. Pon*, 963 F.3d 1207, 1219 (11th Cir. 2020) ("The deference [this Court] show[s] trial courts on evidentiary rulings is especially pronounced in the *Daubert* context, where the abuse of discretion standard places a heavy thumb—really a thumb and a finger or two— on the district court's side of the scale.") (quotations marks omitted). *See also Bhogaita v. Altamonte Heights Condo Ass'n, Inc.*, 765 F.3d 1277, 1291 (11th Cir. 2014) (explaining that a court's discretion is "particularly broad with respect to Rule 403 determinations"). And even if the district court had erred in excluding

22

Dr. Fuller, that error was harmless because his testimony was substantially covered by the jury instructions and closing arguments, as discussed below.

**B.     The District Court Did Not Abuse its Discretion by Giving the Pattern Instruction on § 875(c) and an Abridged Defense Theory Instruction.**

The district court properly instructed the jury on the law.

The court gave the pattern § 875(c) instruction, which charges that Kaye could be found guilty "*only if*" the jury found beyond a reasonable doubt that (1) Kaye "knowingly sent a message in interstate commerce containing a *true threat* to injure the person of another;" and (2) she "sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat" (DE 184:8 (emphasis added)). The instruction also explains that "a 'true threat' is a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would place a reasonable person in fear of being injured" (*id.*). The pattern instruction was legally correct. It was based on the Supreme Court's opinion in *Elonis*. *See* 11th Cir. Crim. Pattern Instr. (Criminal) O30.3 Annotations and Comments. It is consistent with the Supreme Court's recent opinion in *Counterman*.[4] And it was approved

---

[4] In *Counterman*, the Supreme Court held that the First Amendment "requires proof that the defendant had some subjective understanding of the threatening nature of his statements," but "recklessness is sufficient." 143 S. Ct. at 2111. The district court's § 875(c) instruction here required the jury to find a mens rea of at least knowledge, which surpasses recklessness. *See United States v. Curtin*, --

by this Court in *Fleury*. *See Fleury*, 20 F.4th at 1372-74 (holding that the district court acted within its discretion when it gave the § 875(c) pattern instruction's definition of true threats).

The court also gave an abridged version of Kaye's requested defense theory instruction, which accurately summarized her defense. The instruction informed the jury that "the First Amendment of the United States Constitution permits restrictions upon the content of speech in only a few well-defined and narrow classes of speech" (DE 184:8). It also repeated the definition of a true threat from the § 875(c) instruction and explained that Kaye "contends that her statements were not true threats, but rather political speech protected by the First Amendment" (DE 184:8). This instruction from the court made clear to the jury that it had to decide whether the charged statements fell within a narrow class of speech unprotected by the First Amendment: true threats.

The court acted within its discretion when it gave these instructions instead of Kaye's proposed § 875(c) and theory of defense instructions. A refusal to give a requested instruction "will be reversed only if (1) the requested instruction was substantively correct, (2) the court's charge to the jury did not cover the gist of the instruction, and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense."

_____

F.4th --, 2023 WL 5521087, at *2 n.3 (11th Cir. Aug. 28, 2023).

*Fleury*, 20 F.4th at 1372. Kaye's proposed § 875(c) instruction does not meet any of these three prongs, and her defense theory instruction does not meet the latter two.

First, Kaye's proposed § 875(c) instruction was not correct. It removed the objective component of the definition of a "true threat"—that the statement "is made under circumstances that would place a reasonable person in fear of being injured" (DE 107:16). But a "true threat" has both an objective and subjective component. *See Elonis*, 575 U.S. at 726 (noting that § 875(c) requires the jury to find that the defendant "communicated what a reasonable person would regard as a threat," and that the question at issue was whether "the statute *also* requires that the defendant be aware of the threatening nature of the communication") (emphasis added); *Counterman*, 143 S. Ct. at 2114 (explaining that while "[t]he existence of a threat depends" on "what the statement conveys" to the person on the other end, the First Amendment demands a subjective mental-state requirement as well).

Second, the court's charge covered the "gist" of both of Kaye's requested instructions. *Fleury* is instructive. In *Fleury*, the defense requested a theory of defense instruction which—like Kaye's requested instructions—defined "true threats" based on language from *Virginia v. Black,* 538 U.S. 343 (2003): "'True threats' are statements where the speaker[ ] means to communicate a serious

25

expression of intent to commit an act of unlawful violence to a particular individual or group of individuals." *Fleury*, 20 F.4th at 1372. Like the district court here, the district court in *Fleury* instead used the definition of a "true threat" from the § 875(c) pattern instruction. *See id.* This Court upheld the decision to use the pattern definition, because it "covered the substance of Fleury's proposed instruction." *Id.* at 1373. This Court explained: "Fleury's proposed definition of 'true threats' is *a* correct definition, but it is not the *only* correct definition." *Id.*

Here too the court's instructions covered the substance of Kaye's requested instructions. The court's § 875(c) instruction, like Kaye's proposed offense instruction, required the jury to consider Kaye's subjective intent. And the court's defense theory instruction, like Kaye's requested instruction, informed the jury that "[t]he First Amendment of the United States Constitution permits restrictions upon the content of speech in only a few well-defined and narrow classes of speech" (DE 184:8). The defense theory instruction also informed the jury that Kaye contends her statements "were not 'true threats,' but rather, political speech protected by the First Amendment," conveying the distinction. And the court's charge included examples of protected speech ("idle talk, a careless remark, or something said jokingly") to contrast with true threats.

26

Though Kaye's requested instructions elaborate in more depth on types of speech that the First Amendment protects, "[t]he district court was not required to adopt the precise wording of [Kaye's] proposed instruction[s]." *Fleury*, 20 F.4th at 1373. This Court "affords district courts wide discretion to decide on the style and wording of an instruction" so long as it "accurately reflects the law." *Id.* (cleaned up). The district court did not abuse its discretion by being succinct. *Cf. Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 750 F.2d 1516, 1525 (11th Cir. 1985) ("The purpose of jury instructions is to give the jury a clear and concise statement of the law applicable to the facts of the case.") (citation and quotation marks omitted); *United States v. Davis*, 724 F.3d 949, 955 (7th Cir. 2013) ("Jury instructions . . . are not abstract treatises on legal issues; they are instead tailored instructions that state the applicable law in a specific case to aid a jury in reaching its verdict.").

Kaye argues that the court did not "explain what protected political speech meant or encompassed" (Br. 39). But she cites no case holding that a court must instruct the jury not only on the definition of true threats, but on the contours of political speech. That courts do not require a political speech instruction makes sense, because the § 875(c) charge already instructs the jury that it may convict a defendant "*only if*" her speech constituted a "true threat" and was made with knowledge or intent to threaten. A jury following that

instruction cannot convict a defendant based on protected political speech, because if the speech meets the elements of a true threat, it is not protected. *See Fleury*, 20 F.4th at 1365. Kaye's argument that courts must inform juries about protected speech is akin to saying that when a court explains the elements of a crime, it must also explain what conduct is not a crime. But that is not the case. When the court correctly defined a true threat, it did not have to detail the vast array of speech that the First Amendment protects.

Third, the failure to give the proposed instructions "did not substantially impair [Kaye's] ability to present an effective defense." *Fleury*, 20 F.4th at 1373-74. The court advised the jury of Kaye's theory that her statements were protected political speech and made clear that Kaye could be convicted *only if* the jury found she made a true threat. She was thus able to argue that she should not be convicted because her statements were not a true threat. And that is exactly what she did, testifying herself that the videos were a "parody" (DE 183:159) and arguing in closing that her speech was protected (DE 184:38-42).

Kaye contends that the jury's split verdict indicates that the trial was "close," so if the court had given her requested instructions, there is a substantial probability she would have been acquitted of both counts (Br. 41). But the split verdict does not indicate the trial was "close"; instead, it reflects that the jury carefully deliberated and applied the law to the evidence. Even Kaye

28

acknowledges that "her voice was angrier in tone" in the video that was the subject of Count 2 (Br. 13). The jury was free to consider that distinction in determining that the second video contained a "serious threat . . . made under circumstances that would place a reasonable person in fear of being injured." *Fleury*, 20 F.4th at 1372.

Thus, the district court did not abuse its discretion in denying the proposed instructions. And even if it had, any error would be harmless because the court's charge covered the gist of those instructions, and its decision in no way impaired Kaye's ability to present an effective defense. *See id.* at 1373-74.

## II. The Judge's Repeated Instructions that the Jury Could Convict Kaye Based Only on the Evidence and the Law Ensured she was Not Convicted Based on her Political Views.

Nor did the district court abuse its discretion by declining to give Kaye's proposed instruction that the jury could not convict her based on disagreement with her political views. This Court "examine[s] the jury charge as a whole, determining whether the entire charge sufficiently instructed the jury about the issues." *United States v. Singer*, 963 F.3d 1144, 1162-63 (11th Cir. 2020) (cleaned up). Here, the court's charge conveyed that Kaye could not be convicted based on her political views because the court informed the jury—many times—that its decision must rest only on the evidence and the law.

29

First, during voir dire, the court informed the entire jury pool that their "personal views about anything[ ] should not and cannot interfere with [their] duties and responsibilities as jurors to listen to the evidence and to render a fair and impartial verdict based only on the evidence presented here in court and the law that [the court] will provide" (DE 182:27). To ensure that the selected jurors would follow this command, the court asked: "Is there anyone who cannot be fair and impartial in rendering judgment based on the evidence and the law that I instruct you on if you learn that any of the parties or the witnesses hold political beliefs either contrary to or consistent with your own political beliefs?" No jurors raised their hands (DE 182:159).[5]

Then, at the start of trial, the court instructed the jury that it "must follow the law as [the court] explain[s] it," and "must decide [the case] solely on the evidence presented" (DE 182:175). After the close of evidence, the court charged: "Your decision must be based only on the evidence presented here. *You must not be influenced in any way by sympathy for or prejudice against the defendant or the government.* You must follow the law as I explain it, even if you do not agree with the law, and you must follow all of my instructions as a whole" (DE 184:3

---

[5] The court also informed the venire: "[I]n this case, you may briefly hear evidence about the events which took place at the Capitol in Washington D.C. on January 6, 2021. Ms. Kaye is not alleged to have been present at the Capitol for the events of January 6th, and she is not being charged with any events related to January 6th" (DE 182:157).

(emphasis added)). The court later reiterated: "As I said before, you must consider only the evidence that I have admitted in the case" (*id.* at 4). And as discussed, the § 875(c) instruction informed the jury that "[t]he Defendant can be found guilty of this crime *only if* the following facts are proved beyond a reasonable doubt," before setting forth the elements of the crime (*id.* at 7-8 (emphasis added)).

Together, these instructions sufficiently conveyed to the jury that it could not convict Kaye based on her political views, because it could find her guilty only if the evidence established beyond a reasonable doubt that she violated § 875(c). And the instruction that the jury could not be influenced by "prejudice against the defendant" encompassed prejudice based on political beliefs.

The court thus did not abuse its discretion by declining to give the political views instruction, because the court's charge as a whole "cover[ed] the gist" of the requested instruction. *See Fleury*, 20 F.4th at 1372; *cf. United States v. Laury*, 49 F.3d 145, 152 (5th Cir. 1995) (holding that the district court did not err by refusing to give an alibi instruction because the general instruction requiring the jury to "weigh the evidence and judge the credibility of the witnesses," taken with the defendant's closing, "was sufficient to place the alibi defense before the jury"). The court's voir dire further ensured that Kaye was not convicted based on her political views, because the court specifically asked the jurors if they could

render a judgment based on the evidence and the law even if they disagree with Kaye's beliefs (DE 182:159). The jurors, under oath, all confirmed that they could (DE 182:23).

Similarly, in *United States v. Hoffman*, 806 F.2d 703, 710 (7th Cir. 1986), the Seventh Circuit affirmed the defendant's conviction for threatening the life of the President of the United States where evidence of the defendant's religious and political views was admitted at trial. The court rejected the defendant's claim that the jury was prejudiced against him because of this evidence. *See id.* at 710-11. Although the trial court did not give the defendant's proposed instruction that the jury should not be influenced by his religion, the court did charge that the jury should not be swayed by "any prejudice in this case for or against any of the parties." *Id.* at 711 n.4, 718. Plus, the court's voir dire specifically asked the jurors if they could be fair even if the defendant has religious views different then their own. *Id.* at 710. That was enough to reduce the risk of prejudice. *See id.* So too here.

Nor did the refusal to give the instruction substantially impair Kaye's ability to present a defense, because the instructions given were sufficient for her to argue that she should not be convicted based on her political views in closing. And she did so, asking the jurors to "step away from" their politics and recognize

32

that the First Amendment protects Kaye "even if [they] think what she said was stupid, ridiculous, frightening, a bad idea." (DE 184:41-42).

Kaye cites a handful of cases in which courts gave limiting instructions on how to use evidence of a defendant's political views (Br. 44), but none hold that it is an abuse of discretion for a court to decline to give such an instruction. That some courts, in other contexts, have given similar instructions does not mean the court had to do so here. And the cases Kaye cites also involve dissimilar facts. For example, in *United States v. Hunt*, 573 F. Supp. 3d 779, 782 (E.D.N.Y. 2021), the defendant was charged with threatening to assault and murder members of Congress in retaliation for performance of their official duties in violation of 18 U.S.C. § 115(a)(1)(B). His threats referenced "want[ing] actual revenge on democrats," "[m]eaning . . . a public execution of pelosi aoc schumer etc.," and "tak[ing] out" Senators and "replac[ing] them with actual patriots." *Id.* at 783-84. The government introduced evidence of the defendant's white-supremacist and antisemitic views to prove intent. *See id.* at 811. To minimize prejudice, the court gave a limiting instruction that he could not be convicted based on those views. *See id.* Here, by contrast, the government did not introduce evidence of inflammatory hateful or derogatory beliefs likely to prejudice the jury, so a limiting instruction was not necessary as in *Hunt*. And Kaye's threat to shoot a law enforcement officer was not as overtly political as the defendant

33

in *Hunt*'s threat to murder democratic members of Congress.[6]

Kaye also points to a civil First Amendment retaliation case, *Tracy v. Fla. Atl. Univ. Bd. of Trustees*, No. 16-cv-80655 (DE 409) (S.D. Fla.), *aff'd,* 980 F.3d 799 (11th Cir. 2020), in which the same district judge as here gave a similar limiting instruction as part of the statement of the case (Br. 44). In *Tracy*, a professor sued a university because he was fired after publicly questioning whether the Sandy Hook massacre had in fact occurred. As the district court explained, the professor's "political views [were] at the very core of the case," because he alleged that he was fired for expressing his political views and the university maintained that his political speech was not a motivating factor (DE 183:206). The court did not abuse its discretion by finding that the limiting instruction was warranted in *Tracy*, but not here, where the crux of the case was not about Kaye's politics but about whether her statement that she would shoot the FBI if they came to her house was a true threat. And the plaintiff's views in *Tracy* (denying a school shooting), like the defendant's views in *Hunt* (antisemitism and white supremacy), were particularly inflammatory, creating a

---

[6] The other cases Kaye relies on (Br. 44) are even more dissimilar. *See, e.g.*, *United States v. Sisson*, 399 U.S. 267, 276 n.4 (1970) (in the defendant's trial for failing to obey the draft, where the defense was based on the defendant's belief that the Vietnam War was illegal, the court charged that the defendant "may have all the views he likes of a political, ethical, religious or legal nature" but "as long as the law stands as it now stands his motivation, his good faith and the like are not in the least relevant to the question of whether he is guilty or not").

greater need for a limiting instruction.

In short, the district court did not abuse its discretion in rejecting the political views instruction, and any error would be harmless, because the court's charge covered the gist of the proposed instruction. Namely, the instruction that the jury "must not be influenced in any way by . . . prejudice against the defendant" encompassed that Kaye must not be convicted based on her political views.

## Conclusion

Because the district court did not abuse its discretion by excluding the defense's proposed expert or rejecting Kaye's proposed jury instructions, this Court should affirm Kaye's conviction.

Respectfully submitted,

Markenzy Lapointe
United States Attorney

By:    /s/ Alix I. Cohen
Alix I. Cohen
Assistant United States Attorney
99 N.E. 4th Street, #500
Miami, FL 33132
(305) 961-9062
alix.cohen@usdoj.gov

Daniel Matzkin
Chief, Appellate Division

Brandy Brentari Galler
Assistant United States Attorney

Of Counsel

36

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,823 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, 14-point Calisto MT font.

## Certificate of Service

I hereby certify that four copies of the foregoing Brief for the United States were mailed to the Court of Appeals via Federal Express this 13th day of September 2023, and that, on the same day, the foregoing brief was filed using CM/ECF and served via CM/ECF on Michael Caruso, Federal Public Defender, Federal Public Defender's Office and Andrew L. Adler, Assistant Federal Public Defender, counsel for Suzanne Ellen Kaye.

*/s/ Alix I. Cohen*
Alix I. Cohen
Assistant United States Attorney

*Jp*

37