No. 23-11423-A

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

UNITED STATES OF AMERICA,
*Plaintiff/appellee,*

v.

SUZANNE ELLEN KAYE,
*Defendant/appellant.*
_____

On Appeal from the United States District Court
for the Southern District of Florida
_____

REPLY BRIEF BY APPELLANT SUZANNE KAYE
_____

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER
ANDREW L. ADLER
ASS'T FEDERAL PUBLIC DEFENDER
Counsel for Appellant
1 E. Broward Blvd., Suite 1100
Ft. Lauderdale, FL 33301
(954) 356-7436

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

### United States v. Suzanne Ellen Kaye
### Case No. 23-11423-A

Appellant files this Certificate of Interested Persons and Corporate

Disclosure Statement, as required by 11th Cir. R. 26.1.

Adler, Andrew L.

Berry Scott

Brannon, Hon. David Lee

Brown, Richard O.I.

Caruso, Michael

Cohen, Alix I.

Darsch, Shannon

Dispoto, Mark

Fajardo Orshan, Ariana

Galler, Brandy Brentari

Gonzalez, Juan Antonio

Kaye, Suzanne Ellen

Kirkpatrick, Lynn

Lapointe, Markenzy

Matzkin, Daniel

McCrae, Caroline

Militello, Kristy

Reinhart, Hon. Bruce E.

Rosenberg, Hon. Robin L.

Rubio, Lisa Tobin

Schiller, Gregory

United States of America

Zloch, William T.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. C-1

TABLE OF CITATIONS ............................................................................. ii

ARGUMENT AND CITATIONS TO AUTHORITY ................................. 1

    A.    The Court Reversibly Erred by Failing to Adequately Instruct the Jury on Ms. Kaye's First Amendment Defense ....... 4

        1.    The Government Does Not Dispute that Ms. Kaye's Political-Speech Defense Theory Was Legally Correct ....... 4

        2.    The Court's Jury Instructions Did Not Adequately Convey Ms. Kaye's Political-Speech Defense .................... 7

        3.    The Court's Failure to Instruct the Jury on Political Speech Substantially Impaired Ms. Kaye's Defense ........ 17

    B.    The Court Inexplicably Refused to Instruct the Jury Not to Convict Based on Ms. Kaye's Political Views ............................ 20

    C.    The Jury's Split Verdict Confirms the Prejudice ....................... 25

CONCLUSION ......................................................................................... 29

CERTIFICATE OF COMPLIANCE ........................................................ 30

CERTIFICATE OF SERVICE .................................................................. 31

# TABLE OF CITATIONS

## CASES

*Commodores Entm't Corp. v. McClary*,
  879 F.3d 1114 (11th Cir. 2018) ............................................................... 5

*Counterman v. Colorado*,
  600 U.S. 66, 143 S. Ct. 2106 (2023) ..................................................... 10

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................ 11

*United States v. Hoffman*,
  806 F.2d 703 (7th Cir. 1986) ................................................................. 25

*United States v. Morris*,
  20 F.3d 1111 (11th Cir. 1994) ............................................................ 7, 9

*United States v. Ruiz*,
  59 F.3d 1151 (11th Cir. 1995) ................................................ 16, 18, 19

*United States v. Sirang*,
  70 F.3d 588 (11th Cir. 1995) .............................................................. 7, 9

*Watts v. United States*,
  394 U.S. 705 (1969) .................................................. 10, 11, 12, 14, 17

## STATUTE

18 U.S.C. § 875(c) ........................................................................................ 1

## OTHER AUTHORITY

The Freedom Forum,
  The First Amendment: Where America Stands (2023 Update) ......... 14

## ARGUMENT AND CITATIONS TO AUTHORITY

For posting two videos on her social media, Ms. Kaye was charged with two counts of threatening the FBI, in violation of 18 U.S.C. § 875(c). These videos contained profanity and an ostensible threat. But they were also quintessentially *political*. Posted under the username "angry patriot hippie" and entitled "Fuck the FBI," the videos were designed to attract more online followers from fellow "patriot" friends who, like Ms. Kaye, supported former President Donald Trump, identified with his MAGA movement, and questioned the results of the 2020 presidential election.

The videos were a parody of a telephone conversation that Ms. Kaye had with an FBI Agent who wanted to discuss her (non-existent) participation and knowledge of the events at the Capitol on January 6th, 2021. Although Ms. Kaye was polite during the conversation, she told her followers in the videos that she had actually told the FBI that: she would refuse to speak to them unless she had counsel, and they would need to arrest her so she could invoke her right to counsel; she criticized the FBI for "persecuting" a three-star general (*i.e.*, Michael Flynn); she invoked her First Amendment right to free speech; and she invoked her Second Amendment right to shoot the FBI if they came to her house.

1

The trial boiled down to one question: were Ms. Kaye's statements political speech protected by the First Amendment, as she claimed, or were they "true threats," as the government claimed? Working off a script, the two videos were nearly identical; the only difference was in tone, not substance. It therefore surprised everyone when the jury acquitted her of one count but convicted her of the other. The court sentenced her to 18 months in prison. At present, Ms. Kaye has been incarcerated for less than three months and has already suffered life-threatening seizures similar to one she suffered in open court.[1]

In her initial brief on appeal, Ms. Kaye argued that the district court issued multiple rulings that, taken individually and together, created an intolerable risk that the jury convicted her of protected political speech. Primarily, Ms. Kaye argued that, despite her repeated requests to do so, the court completely failed to instruct the jury about the law relating to political speech, even though that formed the basis of her defense. Secondarily, she argued that the court erred by refusing her request to instruct jury not to convict her based on any disagreement with

---

[1] These health-related issues have been the subject of recent hearings in the district court. Due to these health issues and her projected release date, Ms. Kaye is simultaneously filing a motion to expedite this appeal.

2

her political beliefs, even though those beliefs were at the forefront of the trial and concerned some of the most polarizing issues in America today.

On the first point, the government's position on appeal boils down to this: because the court instructed the jury that it had to find a "true threat" before convicting her, the court did not need to inform the jury about political speech *at all*—nothing about what it means, and nothing about the broad protection that it receives. But that was the defense, and so this glaring instructional omission is reversible error. The prejudice of that error was compounded by the court's refusal to instruct the jury not to convict based on Ms. Kaye's political views. And the prejudice was confirmed by the split verdict, reflecting how close this trial was even without informing the jury about protective First Amendment principles.

Failing to vacate Ms. Kaye's conviction would not only conflict with Supreme Court precedent; it would set a dangerous precedent of its own. Every day, people engage in political speech online that contains violent rhetoric. If courts do not have to inform juries about what political speech means or the broad protection it receives, then it will cease to in fact enjoy such protection. And the government could readily convict people just for engaging in speech that it does not like. This case serves as Exhibit A.

3

## A. The Court Reversibly Erred by Failing to Adequately Instruct the Jury on Ms. Kaye's First Amendment Defense

As the government explained at trial, the "ultimate issue in th[is] case" was whether Ms. Kaye's statement is "constitutionally protected political speech or is it a true threat." (DE 179:6). The government further acknowledged that, to resolve that ultimate issue "at the heart of the case," the jury would need "to determine what is and what isn't political speech." (*Id.* at 5–6). That was 100% correct. Yet the government now argues (at 27) that the district court did not need to tell the jury *anything* about the law relating to political speech. That cannot possibly be right.

### 1. The Government Does Not Dispute that Ms. Kaye's Political-Speech Defense Theory Was Legally Correct

Before addressing the crux of this appeal, it is helpful to clear away the underbrush by identifying what is not in dispute between the parties.

a.     When challenging the court's failure to give a jury instruction, including a theory-of-defense instruction, the Court must first determine whether the proposed instruction was substantively correct. The parties agree on that. And the government does not dispute (at 24–25) that Ms. Kaye's proposed theory of defense—setting out various First Amendment principles relating to political speech—was legally sound.

4

Here's how that defense arose procedurally. The district court initially excluded Ms. Kaye's expert witness from testifying about the broad First Amendment protection historically afforded to violent political speech. (DE 83:9–10). The government (at 19–20, 22) defends that exclusion on the ground that "what constitutes 'political speech'" was a "purely legal matter," and this Court's precedent provides that "the court must be the jury's only source of law." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128–29 (11th Cir. 2018) (quotation omitted).

Ms. Kaye agrees with the government about that. But while this point may insulate the district court's expert ruling, it serves only to bolster rather than undermine Ms. Kaye's main argument here, which focuses on the adequacy of the court's jury instructions. As she previously explained (at 35), and as she told the court (DE 183:197), if the meaning of, and broad protection afforded to, political speech was a question of First Amendment law not subject to expert testimony, then the court *itself* was required to instruct the jury about that applicable law.

That is exactly what Ms. Kaye asked the court to do. Her proposed offense and theory-of-defense instructions included numerous First Amendment principles about political speech, all of which were taken

5

directly from binding Supreme Court precedents. (DE 107:16–21). These precedents make clear that political speech occupies the very core of the First Amendment. It includes offensive and crude commentary about public affairs. And criticism of the government. And cursing at law enforcement. And advocating violence short of incitement. And so on. In her initial brief, Ms. Kaye recounted these principles and precedents (at 19–21, 28, 35–39), and the government does not dispute that they are correct statements of the law. (In fact, the government completely ignores these important constitutional principles). So the first prong is satisfied.

**b.**    Unwilling to just move on, the government injects unnecessary confusion by defending an aspect of the instructions that Ms. Kaye is not challenging on appeal. It asserts (at 25–26) that Ms. Kaye's proposed definition of a "true threat" was not correct because it omitted an objective component; and it asserts that the court's "true threat" definition covered the "gist" of her subjective-intent request.

But, on appeal, Ms. Kaye did not challenge the *mens rea* component of the court's "true threat" definition. Rather, she is making a very different argument: the court failed to include anything—in either its offense instruction or, more critically, in its (substantially truncated)

6

theory-of-defense instruction—that explained the legal concept of political speech, which formed the entire basis of Ms. Kaye's defense.

In that regard, the government attacks additional straw men. Contrary to its assertions (at 27–28), Ms. Kaye is not arguing that the court had to "elaborate in more depth on types of speech that the First Amendment protects"—no, just political speech. Nor is she quibbling with the "wording," "style," or "succinct[ness]" of the court's instructions. Her argument is far more fundamental. As explained below, the court did not include *any* explanation *at all* about the concept or meaning of political speech, much less the broad scope of protection that it receives.

### 2. The Court's Jury Instructions Did Not Adequately Convey Ms. Kaye's Political-Speech Defense

"A defendant is entitled to have the case submitted to the jury in a manner which will enable the jury fairly to consider [her] proffered defenses." *United States v. Morris*, 20 F.3d 1111, 1117 (11th Cir. 1994) (quotation and brackets omitted). In that regard, this Court has "repeatedly held that a defendant is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to the theory of [her] defense." *Id*. (quotations omitted); *accord United States v. Sirang*, 70 F.3d 588, 593 (11th Cir. 1995) (same).

7

The government neglects those settled principles here. It does not dispute that the court failed to provide any instruction at all about the substantive law of political speech under the First Amendment, even though that was the entire basis of Ms. Kaye's defense. The government nonetheless asserts that her First Amendment political-speech defense was adequately conveyed by other aspects of the instructions. It was not.

**a.** To begin, the court's instructions included only a single reference to "political speech"—and it was conclusory at best and misleading at worst. The court's theory-of-defense instruction provided: "Ms. Kaye contends that her statements were not 'true threats,' but rather, political speech protected by the First Amendment." (DE 119:10).

While this single sentence accurately summarized Ms. Kaye's defense, it did nothing to allow the jury to evaluate it, for the court failed to include anything about the *law*. Ms. Kaye did not need the court to tell the jury what her "contention" was; she could do that in closing. Rather, she needed the court to offer some explanation about what "political speech" meant under the law. After all, that was the basis for her defense.

Yet the court failed to say anything about that at all. The court did not explain that political speech lies at the heart of the First Amendment.

8

The court did not explain what political speech includes. The court did not even explain that political speech was a recognized category of protected speech, much less one entitled to maximum First Amendment protection. The court's conclusory sentence is exactly the sort of "abstract or general" instruction that is insufficient under this Court's precedent. *Sirang*, 70 F.3d at 593; *see Morris*, 20 F.3d at 1117–18.

Worse still, the court's instruction risked badly misleading the jury. By referring to Ms. Kaye's "contention" that her speech was protected political speech, the court may have incorrectly suggested that the legal premise of her defense—*i.e.*, that the First Amendment protects political speech—was somehow debatable or even invalid. But it is black-letter law. Informing the jury only that Ms. Kaye "contends" that her speech was political speech—without saying anything at all about what political speech meant under the law—did not come close to what was necessary to properly convey Ms. Kaye's First Amendment political-speech defense.

**b.** The government implicitly acknowledges as much, for its main argument relies instead on the court's "true threat" instruction. But that instruction made no mention of "political speech" at all. To further

9

explain why that instruction was insufficient, it is necessary to explain the relationship between protected political speech and "true threats."

i. As Ms. Kaye previously explained (at 28), and the government does not dispute, political speech occupies the core of the First Amendment. Most threats of violence do not implicate that core, but some of them do. Indeed, some of the Supreme Court's own "true-threats cases involve[d] such charged political speech." *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 2122 (2023) (Sotomayor, J., concurring in part and concurring in the judgment) (citing cases); *see id*. at 2128 (repeating that "this Court's own cases show time and again how true-threats prosecutions sweep in political speech"). And in such threat cases, the trier of fact will be required to decide whether the statement is protected political speech, or whether it is instead an unprotected "true threat."

That is exactly what the Supreme Court said in the seminal case involving the intersection between political speech and "true threats." In *Watts v. United States*, 394 U.S. 705 (1969), the Supreme Court held that, as a matter of law, the defendant's ostensible threat to shoot the President was political speech protected by the First Amendment. In so

10

holding, the Court made clear that "[w]hat is a threat must be distinguished from what is constitutionally protected speech." *Id*. at 707.

That critical distinction cannot be properly drawn where the trier of fact is not informed *at all* about political speech. *Watts* again illustrates the point. There, the Court concluded that the statement was protected speech—not a "true threat"—because of fundamental principles affording broad protection to political speech. *See id*. at 708 (emphasizing the "'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'") (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *id*. ("The language of the political arena, like the language used in labor disputes, is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was a kind of very crude offensive method of stating a political opposition to the President.") (internal citation and quotation marks omitted).

These fundamental and protective First Amendment principles were critical to *Watts*' conclusion that the statement there was protected

11

political speech rather than an unprotected "true threat." The Court could not have properly drawn that dispositive distinction without them.

**ii.** Neglecting *Watts*, the government (at 27–28) appears to take the rather extreme position that the court was not required to provide *any* instruction *at all* about what political speech means or includes, let alone that it receives broad protection under the First Amendment. The government reasons that Ms. Kaye's political-speech defense was adequately covered, because the court instructed the jury that it was required to find that Ms. Kaye made a "true threat" in order to convict her; and "true threats" are (by definition) not protected political speech.

But *Watts* teaches that the jury could not properly determine whether Ms. Kaye's statements were "true threats"—as opposed to protected political speech—without being informed about *both* categories. As the facts of both *Watts* and this case illustrate, statements can be *both* political *and* threatening in nature. In such cases, the jury will have to decide which bucket the statement falls into: is it more like protected political speech, or is it more like a "true threat?" To do so, the jury must be informed about both categories. It cannot be instructed *only* about the meaning of a "true threat" but not at all protected political speech.

12

Another way to think about this is that "true threats" are an "exception" to the First Amendment. The court told the jury as much here. But the jury could not properly evaluate the scope of that exception without knowing anything about the scope of the rule. And the relevant rule here is that political speech lies at the heart of the First Amendment, and such speech can include offensive, profane, and even violent rhetoric criticizing the government. Without being informed about such non-true (*i.e.,* protected) threats, the jury lacked the proper basis for comparison.

This dynamic explains why even the pattern instruction defines a "true threat" by speech that it does *not* include—namely, "idle talk, a careless remark, or something said jokingly." (DE 119:9–10). The government admits (at 26) that these "examples of protected speech" are included to help a jury "contrast" protected speech from "true threats." Exactly. But while these examples may be helpful in many threat cases, they were not helpful here, where the only issue was whether the statements were *political* speech. Ms. Kaye did not claim her statements were "idle talk, a careless remark, or something said jokingly." Just the opposite: she claimed to be engaged in deliberate and serious political expression; indeed, her videos expressly invoked the First Amendment.

A freestanding "true threat" instruction was particularly inadequate because lay juries are not First Amendment experts. Indeed, the First Amendment is commonly misunderstood. A recent survey found that, when it comes to speech, "Americans don't realize just how much their most valued freedom protects"; for example, only "6 in 10 Americans know that books are protected by the First Amendment." The Freedom Forum, The First Amendment: Where America Stands (2023 Update).[2]

Surely, then, juries cannot be presumed to know about cases like *Watts*. Or that speech using violent rhetoric has otherwise received broad First Amendment protection. As Ms. Kaye repeatedly explained (at 18, 32, 35), and the government does not dispute, what constitutes protected political speech is by no means common knowledge. The broad scope of constitutional protection for such speech is not something juries can intuit without legal instruction from the court. And it is far too important to be left unsaid in cases like this, where the sole defense is that the "threat" constitutes political speech at the core of the First Amendment.

Instructing the jury *only* about the "true threat" definition—and not at all about the meaning or scope of political speech on the other side of

---

[2] https://survey.freedomforum.org/2023-update/.

the line—was thus a prejudicial one-sided instruction. Once again, political speech resides at the core of the First Amendment; it therefore receives maximum constitutional protection. But jurors do not know that. If anything, they are likely to assume that violent political rhetoric is *not* protected. In a case like this one, then, informing the jury only about the meaning of a "true threat"—and not at all about political speech or the broad protection it receives—will unfairly skew the evaluation. It will place a heavy thumb on the scale—and in the wrong direction. It will push the jury towards finding a "true threat" and away from finding political speech, transforming the "true threat" exception into the rule.

**iii.**    The government nonetheless tries to make the district court's inverted approach to the First Amendment seem innocuous. To do so, it asserts (at 28) that the court's approach here was "akin" to instructing juries only about the elements of the crime and not about "what conduct is not a crime." But, in fact, the approach was more akin to instructing a jury only about the elements of the crime and not about an affirmative defense. And it is well established that "[a] criminal defendant has the right to have the jury instructed on her theory of defense, separate and

15

apart from instructions given on the elements of the charged offense." *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995).

Imagine a murder case where the defendant is accused of shooting someone who mistakenly stumbled onto his porch, and the defense is based on a broad "stand-your-ground" law. Surely it would not suffice for the court to instruct the jury only about the elements of murder, and then tell the jury *only* that the defendant's "contention" was that he was "standing his ground"—without saying anything at all about the actual stand-your-ground law. That would not adequately convey the defense.

So too here. The court instructed the jury only about the "true threat" element, and then told the jury that Ms. Kaye's "contention" is that her statement was protected political speech—without saying anything at all about what political speech meant under the law. And just as jurors cannot be presumed to know that the law gives homeowners broad authority to shoot people who may have mistakenly stumbled onto their porch, jurors cannot be presumed to know that the First Amendment broadly protects profane and violent rhetoric criticizing the government. The result here, though, was not the effective evisceration of some state-law affirmative defense but rather the First Amendment.

16

Finally, the government observes (at 27) that Ms. Kaye "cites no case holding that a court must instruct the jury not only on the definition of true threats, but on the contours of political speech." But the government cites no case supporting its extreme position either. And the most likely explanation for the lack of authority is that, in political threat cases like this one, courts will say at least *something* about the protection afforded to political speech. Following *Watts*, it is difficult to imagine courts doing what the court did here—completely denying any instruction about the meaning of political speech or the broad constitutional protection it enjoys. At the very least, the lack of authority means that Ms. Kaye's argument here warrants careful consideration.

### 3. The Court's Failure to Instruct the Jury on Political Speech Substantially Impaired Ms. Kaye's Defense

Because the court did not adequately instruct the jury on Ms. Kaye's First Amendment political-speech defense, the only question is whether this impaired her ability to mount a defense. There can be no question that it did for the reasons already discussed. As explained, without being instructed about what political speech legally means or includes, or the broad scope of protection it receives, a lay jury unfamiliar with First Amendment principles could not properly evaluate whether

17

Ms. Kaye's statements were unprotected "true threats" on the one hand or protected political speech on the other. Once again, the parties agreed that this was the heart of the case and the core of Ms. Kaye's defense. Yet the jury was instructed on only *half* the applicable First Amendment law, unfairly skewing the jury's evaluation in favor of finding a "true threat."

The government does not seriously argue otherwise. Devoting just one short paragraph to this issue, it asserts (at 28) that the court's instructions did not prevent Ms. Kaye from presenting an effective defense because she could argue in *closing* that her statements were not "true threats" and were instead protected speech. But binding precedent, as well as elementary legal principles, squarely foreclose that argument.

In *United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995), the district court's "willfulness" instruction failed to adequately convey the "mistake of fact" defense. *Id*. at 1154–55. The Court then rejected as "disingenuous" the same argument the government makes here: "The government disingenuously argues that denial of the instruction was harmless error because counsel was allowed to present the defense theory in closing argument. The jurors were instructed to be guided solely by the evidence and the court's instructions, and not by counsels' argument. The

failure to give the requested instruction seriously impaired the defense because Ruiz' beliefs were critical to her entire theory." *Id*. at 1155.

The same logic applies here. As mentioned above, the government itself emphasizes (at 20, 22) that, under this Court's precedents, the court must be the "singular source of law." And, in this very trial, the district court repeatedly told the jury that what the lawyers say is "not evidence and must not be considered," and it "isn't binding on you." (DE 182:176; DE 184:4). That is precisely why defense counsel repeatedly urged the court to instruct the jury about the First Amendment's protections for political speech, recognizing that "what I say is not [the] law." (DE 183:201–02). But the court refused to instruct the jury on that law.

That refusal prevented Ms. Kaye from effectively presenting her defense. After all, her defense was that the statements were not "true threats" *because* they were political speech. So while she could argue that her statements did not satisfy the court's "true threat" definition, she could *not* argue that they were actually political speech falling on the other side of the line. Because the court never instructed the jury about what political speech legally meant, or that it was entitled to broad

19

protection, Ms. Kaye could not effectively present her defense. The legal principles undergirding her defense were never conveyed by the court.

In short, any arguments by counsel could not somehow cure the court's complete and total failure to instruct the jury about fundamental legal principles forming the basis of Ms. Kaye's First Amendment defense and bearing directly on the dispositive question for the jury. Without any such instruction by the court, Ms. Kaye was just screaming into the void.

## B. The Court Inexplicably Refused to Instruct the Jury Not to Convict Based on Ms. Kaye's Political Views

The instructional error above is dispositive of this appeal. But the need for vacating the conviction is further bolstered by a related omission from the instructions pertaining to Ms. Kaye's political beliefs. Whether or not this additional omission is independently reversible, the key point is that it exacerbated the risk of a conviction based on political speech.

**1.** At trial, Ms. Kaye asked the district court to instruct the jury not to convict "because you disagree with or find distasteful her political views." (DE 107:22–23). In her initial brief (at 42–43), she explained that the court's refusal to give this instruction was inexplicable because convicting someone based on a disagreement with their political beliefs would be an egregious violation of the First Amendment. The government

20

does not dispute that point now. Nor does the government dispute that Ms. Kaye's proposed instruction was otherwise legally correct.

**2.** Instead, the government's lead argument is that Ms. Kaye's requested instruction was covered by other instructions given. But *none* of them directed the jury not to convict based on political disagreement.

**a.** The government refers (at 29–30) to generic instructions directing the jury to base its decision only on the evidence and "the law" as provided by the court. But that is precisely the problem. The court's instructions on the law said *nothing* about Ms. Kaye's political views. Had the court simply given her instruction, the jury would have been directed not to consider her views. If anything, then, directing the jury to consider the law as provided highlights (not mitigates) the problem.

On top of that, those directions exacerbated the substantive instructional error. As explained, the court's instructions were fatally incomplete because they failed to instruct the jury on fundamental First Amendment principles undergirding Ms. Kaye's political-speech defense. Thus, by repeatedly directing the jury to consider this (incomplete) law, the court ensured that the jury could not properly evaluate her defense.

21

**b.**     The government (at 30) refers to a question during voir dire, where the court asked potential jurors whether they could be fair based on the evidence and the law "if you learn that any of the parties or the witnesses hold political beliefs contrary to or inconsistent with your own political beliefs?" (DE 182:159). But this was just a preliminary question, not an instruction. It was also conditional, devoid of context, and did not specifically refer to Ms. Kaye. At no point during the trial did the court actually instruct the jurors not to convict based on her political views.

**c.**     Finally, the government emphasizes (at 30) that the court instructed the jury not to be "influenced in any way by sympathy for or prejudice against the defendant or the government. You must follow the law as I explain it, even if you do not agree with the law . . . ." (DE 184:3). The government asserts (at 18, 31, 35) that "prejudice against the defendant" "encompassed prejudice based on political beliefs." But the court did not refer to "political beliefs" at all. And "prejudice" could mean just about anything. Again, the jury should not have to *infer* from some generic instruction that it could not convict based on political viewpoint.

**3.**     The need for an explicit instruction was particularly acute in this case. In her initial brief (at 45–51), Ms. Kaye explained at length how

her political beliefs were at the forefront of this trial, and how those beliefs involved some of the most polarizing issues in our country today: Donald Trump; MAGA; the 2020 election; January 6th; the prosecution of Michael Flynn; the Second Amendment, etc…. These topics are "deal-breakers" for many people and relationships; people are just unable to get past them or see the other side. And this trial occurred in Palm Beach County, which has more registered Democrats than Republicans. Inevitably some of the jurors in this trial strongly disagreed with Ms. Kaye about these polarizing topics. The government does not dispute any of that. The upshot is that an explicit instruction was necessary to ensure that political disagreement did not infect the jury's deliberations.

The government attempts to downplay the political nature of this trial. It asserts (at 34) that the "crux" of the case was "not about Kaye's politics but about whether her statement" was a "true threat." But that "threat" was not made in a vacuum. It was the culmination of videos expressing Ms. Kaye's political opposition to the FBI ("Fuck the FBI"). And that political opposition derived from her support for Trump, her affiliation with his MAGA movement, and her belief that the FBI had previously "persecuted" Trump's former National Security Advisor.

23

These political beliefs were no secret. Ms. Kaye shared them with the jurors herself. She *had* to; they were indispensable context for the videos.

The government weakly asserts (at 33–34) that there was no evidence of "inflammatory hateful or derogatory beliefs likely to prejudice the jury." But jurors affiliated with the Democratic party would surely disagree with that assessment. Indeed, millions of Americans passionately believe that Trump and his MAGA movement hold derogatory or hateful beliefs. Take, for example, Ms. Kaye's belief that the 2020 election was rigged or stolen. And the government's assertion is particularly rich given that the prosecution here went out of its way to suggest that Ms. Kaye was present at the Capitol on January 6th—which many believe was a *coup d'état* orchestrated by Trump—even though the court had specifically instructed the jury that she was not charged with being present, and even though the government had no evidence that she was present. *See* Initial Br. 11 n.3, 48–49. Surely it is inflammatory to gratuitously suggest—without evidence—that she participated in a *coup*.

Given the high risk of prejudice, the court's refusal to give the requested instruction—which all agree was correct—is indefensible. All the more so because, as Ms. Kaye documented in her initial brief (at 44),

24

this sort of instruction has been given in other cases, including by the very same judge who presided over this trial. The government's effort to distinguish a few of those cases (at 33–34 & n.6) are premised on its view that this case was just not that political or inflammatory. But, again, it was. And Ms. Kaye's point is not that the cases are identical or mandated the instruction here; the point is that this sort of instruction is commonly and cautiously given where polarizing views risk infecting the jury. There is simply no valid reason for refusing to give that instruction in this trial.[3]

### C. The Jury's Split Verdict Confirms the Prejudice

For the reasons explained above, the instructional omissions went to the heart of this trial and created an intolerable risk of a conviction based on Ms. Kaye's political speech/views. Lest there be any doubt, the jury's split verdict powerfully confirms that the risk here was too high.

_____

[3] The government cites *United States v. Hoffman*, 806 F.2d 703 (7th Cir. 1986), where the defendant was convicted of threatening the President for his failure to pardon a religious leader to whom the defendant was loyal. However, unlike in this case, and contrary to the government's characterization (at 32), the defendant there did not even ask the court to instruct the jury not to consider religious affiliation; in fact, the "court instructed the jury precisely as the defendant requested." *Id.* at 711 n.4. And, unlike in this case, the court engaged in a "meticulous, thorough, clear, and concise questioning of potential jurors about their religious beliefs and prejudices," ultimately excusing two of them. *Id.* at 710.

1.      Although the district court failed to instruct the jury about the substantive law underlying Ms. Kaye's political-speech defense, and although the district court inexplicably refused to instruct the jury not to convict Ms. Kaye based on a disagreement with her conspicuous and polarizing political views, this trial was still a nail-biter.

We know that because of the jury's split verdict. As Ms. Kaye previously explained (at 5–6, 41), the jury acquitted Ms. Kaye of the video in Count One but convicted her of the video in Count Two—even though all agreed that the videos was very similar. Since Ms. Kaye was working off a script, the only difference was in tone, not the substantive message.

On appeal, the government (at 28–29) does not identify any other difference, yet still asserts that the split verdict "does not indicate that the trial was 'close.'" But the government fails to explain that puzzling assertion. It says (at 28) only that the verdict "reflects that the jury carefully deliberated and applied the law to the evidence." But if that's true, then that confirms how close the trial actually was. If the jury carefully and properly deliberated, and yet still delivered the split verdict despite the very similar videos, then that means the trial was extremely close. If a slight difference in her tone truly made all the difference, then

26

there is a good chance that the jury would have acquitted on both counts had it been properly instructed about the protective First Amendment principles forming the basis of Ms. Kaye's political-speech defense.

**2.**     There is another possibility, but it is even more troubling. As Ms. Kaye explained (at 52), the split verdict could have been a "compromise" driven not by some slight variation in her tone but rather by the inability of the jurors to agree in light of differences in their political ideology. In a politically polarizing case like this—and especially absent an explicit instruction not to convict based on a disagreement with Ms. Kaye's political views—Democratic jurors may have been firmly in favor of a conviction, while Republican jurors may have been firmly in favor of an acquittal. A split verdict would have broken the impasse. The government, notably, does not deny that this was a real possibility. And if *that* is what happened, then it means Ms. Kaye was in fact convicted for expressing her political views—a blatant First Amendment violation.

**3.**     Either way, then, the split verdict confirms just how consequential the above instructional omissions were in this case. Even though the court failed to instruct the jury about the protective First Amendment principles underlying Ms. Kaye's political-speech defense,

27

this trial was still very close. And that is assuming that the jurors put politics aside. But the court's failure to instruct the jurors not to convict Ms. Kaye based on a disagreement with her political views, especially viewed in light of the verdict, further exacerbates the alarming concern that Ms. Kaye was in fact convicted for engaging in political speech and expressing unpopular political views—core First Amendment conduct.

*    *    *

To recap: the court gave Ms. Kaye a theory-of-defense instruction in name only. The court's instructions were inadequate in that regard because they failed to say *anything* about the longstanding, fundamental, and protective First Amendment principles forming the basis of Ms. Kaye's political-speech defense. That glaring omission was fatal. And although that error requires vacatur, the prejudice was exacerbated by the court's refusal to instruct the jury not to convict Ms. Kaye based on a disagreement with her political views, which were front-and-center and deeply polarizing. Finally, the split verdict confirms just how prejudicial these omissions were. Bottom line: Ms. Kaye's conviction cannot stand.

## CONCLUSION

For the foregoing reasons, Suzanne Kaye respectfully requests that

the Court vacate her conviction and remand for further proceedings.

Respectfully submitted,

MICHAEL CARUSO
 FEDERAL PUBLIC DEFENDER

*/s/ Andrew L. Adler*
ANDREW L. ADLER
  ASS'T FEDERAL PUBLIC DEFENDER
  Counsel for Appellant
  1 E. Broward Blvd., Suite 1100
  Ft. Lauderdale, FL 33301
  (954) 356-7436

29

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 6,058 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in New Century Schoolbook 14-point font.

*/s/ Andrew L. Adler*

**CERTIFICATE OF SERVICE**

I certify that on this 25th day of September 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and it is being served this day via CM/ECF on Alix I. Cohen, Assistant U.S. Attorney, 99 N.E. 4th Street, Suite 523, Miami, FL 33132.

*/s/ Andrew L. Adler*